UNITED STATES

v.

**James D. HARRIS II, Corporal (E–4), U.S. Marine Corps.**

**NMCM 9900265.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 6 Feb. 1997.

Decided 31 Jan. 2001.

LT Michael A. Castelli, JAGC, USNR, Appellate Defense Counsel.

LT Jason L. Weissman, JAGC, USNR, Appellate Defense Counsel.

LCDR Philip Sundel, JAGC, USNR, Appellate Government Counsel.

Maj Mark K. Jamison, USMC, Appellate Government Counsel.

Before DORMAN, Senior Judge, OZMUN, and NAUGLE, Appellate Military Judges.

*DORMAN, Senior Judge:*

Following a contested trial, officer and enlisted members of a general court-martial convicted the appellant of disrespect toward and disobedience of a noncommissioned officer, and the wrongful use of marijuana. The appellant's offenses violated Articles 91 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 891 and 912a. The approved sentence includes confinement for 30 days, forfeiture of $1,196 pay for one month, reduction to pay grade E–3, and a bad-conduct discharge.

We have carefully conducted our review of this case in accordance with Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). In conducting our review, we considered the record of trial, the appellant's assignment of error, the Government's response, and the briefs filed by both the appellant and the Government in response to issues specified by this court. We have also considered the excellent oral arguments presented by appellate counsel at the Naval

Justice School in Newport, Rhode Island on 29 September 2000. Following our review, we find that the appellant is entitled to relief.

On 27 March 2000 the appellant submitted his brief and assignment of error to this court. In his single assignment of error, he challenged the legal and factual sufficiency of the evidence in support of his conviction for the use of marijuana. In reply, the Government filed its brief arguing that the evidence was in fact both legally and factually sufficient. Following our initial review of the record and pleadings we specified the following issues and ordered oral argument.

ASSUMING THAT *UNITED STATES V. BARNES*, 53 M.J. 624 (N.M.Ct.Crim. App.2000) CORRECTLY APPLIES *UNITED STATES V. CAMPBELL*, 50 M.J. 154 (1999), *SUPPLEMENTED ON RECONSIDERATION*, 52 M.J. 386 (2000), DID THE MILITARY JUDGE ERR WHEN HE INSTRUCTED THE MEMBERS THAT THEY COULD INFER THAT THE APPELLANT KNEW HE USED MARIJUANA BASED UPON THC BEING FOUND IN HIS URINE? Record at 269.

ASSUMING AN AFFIRMATIVE ANSWER TO THE FIRST SPECIFIED ISSUE, WAS THIS INSTRUCTIONAL ERROR PLAIN ERROR, AND IF SO, WHAT, IF ANY, RELIEF SHOULD BE AFFORDED THE APPELLANT?

### Facts

During the early evening hours of 20 June 1996, a field day was being conducted in barracks 2001 on board Marine Corps Base, Quantico, Virginia. When Lance Corporal [LCpl] Massimino was cleaning around the doorway of Corporal [Cpl] Baumann's third-deck barracks room, he smelled the odor of burning marijuana coming from Cpl Baumann's room. LCpl Massimino reported this information to Cpl Guagenti, the noncommis-

sioned officer of the third deck. Cpl Guagenti could also smell burning marijuana coming from Cpl Baumann's room, so he knocked on the door. About 10–15 seconds later, Cpl Baumann answered the door. When Cpl Guagenti entered the room the windows were wide open, incense was burning, and there was a smell of "spray stuff" in the air. Two people were in the room, Cpl Baumann and the appellant. The appellant was sitting on a sofa facing the wall. His hands were on his knees and he was looking down at the floor. The appellant did not make eye contact with Cpl Guagenti, who then left and reported the situation to Sergeant [Sgt] Pomeroy. Sgt Pomeroy contacted her roommate, Sgt Richardson and they went to Cpl Baumann's room. They both testified that they identified the smell of burned marijuana outside the room. Sgt Richardson also testified that she could hear an aerosol can being used inside the room. She notified the provost marshal's office [PMO]. PMO personnel were dispatched to the barracks and a small quantity of marijuana was found in Cpl Baumann's room.

Cpl Baumann testified that the marijuana found in his room was some that the appellant had given him. He also testified that on 20 June the appellant came to his room asking for rolling papers. Cpl Baumann gave him some and the appellant rolled a marijuana cigarette that they then smoked together.[1] While they smoked, the windows were open and they burned some incense. Cpl Baumann was also using furniture polish on everything he was cleaning so that it would smell like lemon. After they had put out the marijuana cigarette, Cpl Guagenti knocked on the door and Cpl Baumann let him in. Of the Government witnesses, only Cpl Baumann testified that the appellant smoked marijuana. Several other witnesses, to include Staff Sergeant McLaughlin, Sgt Chupa, and LCpl Harden, interacted with the appellant shortly after he had been in

---

1. Corporal Baumann was convicted by special court-martial for three specifications of violating Article 112a, UCMJ, 10 U.S.C. § 912a. At his court-martial he pled guilty pursuant to the terms of a pretrial agreement [PTA] he entered into with the convening authority of his court-martial, his battalion commander. Under the terms of the PTA, Cpl Baumann was only required to serve 15 of the 45 days to which he was sentenced. He was also required "to remain in the area," (Record at 145) so that he could testify in the appellant's trial. As of the date of appellant's court-martial, Cpl Baumann was waiting to go on appellate leave.

Cpl Baumann's room. None of them testified that the appellant appeared under the influence of marijuana. In fact, the focus of their testimonies was that the appellant was rather agitated shortly after he had been in Cpl Baumann's room.

On 21 June 1996 the appellant voluntarily submitted a urine sample for drug testing. The collection procedures and forwarding of the sample to the Navy Drug Screening Lab [NDSL] were completed in accordance with regulations. The only unusual aspect of the collection process was the fact that the appellant was unable to control his bladder while waiting to provide a sample. He urinated in his trousers before a sample could be provided. Once the sample was provided, it was forwarded to the NDSL.

The Government presented testimony of Ms. J.E. Driskell, a forensic chemist from the NDSL, who testified concerning the standard lab procedures used in the NDSL and the results of the tests conducted on the appellant's urine sample. These results were admitted without objection. The tests conducted on the appellant's urine sample did not conform to the normal flow of processing of samples in the lab.

The NDSL tested the appellant's urine sample in June 1996 and returned a "negative" report to the appellant's command. Ms. Driskell testified as to the normal testing procedures, including the requirement that a sample be screened positive on two immunoassays, and then confirmed positive by gas chromatography mass spectrometry [GC/MS]. The appellant's sample, however, did not screen positive for the metabolite for marijuana [THC] during the initial immunoassay, but it did screen positive for the presence of another drug. Confirmatory testing for the other drug resulted in a negative report for that drug. Since the appellant's urine sample screened positive for one drug, the NDSL was required to freeze the appellant's sample and store it for one year.

In December 1996, the NDSL received an inquiry from the trial counsel concerning the results of the appellant's drug test. Ms. Driskell testified that because the appellant had been charged with using marijuana she was authorized to provide information concerning the initial screening for use as impeachment or rebuttal evidence. Record at 197. Ms. Driskell reviewed the request and noted that the initial screening had revealed the presence of THC at a level below the DoD cutoff level. Because the NDSL had improved their screening capabilities since the date of the first screening, she decided to subject the appellant's urine sample to a confirmatory test using GC/MS. That test revealed THC in the sample in the amount of 15.8 nanograms per milliliter [ng/ml] of urine. This amount was just above the DoD cutoff level of 15 ng/ml, and resulted in a "positive" result. A second confirmatory test was also conducted resulting in a reading of 14 ng/ml. Although this was below the DoD cutoff, it was still considered a positive result because the first confirmatory test was above the cutoff level. Ms. Driskell also testified that THC does not naturally occur in the human body, and that the DoD cutoff for the GC/MS test is established in part "to dispel the passive inhalation defense." Record at 193.

During the appellant's case in chief, the only evidence the appellant offered concerning his alleged use of marijuana was the testimony of his fiancée. She testified that she used to date Cpl Baumann, and that he was very upset when they broke up and she began dating the appellant. She claimed that Cpl Baumann sent her threatening letters after they broke up. She also reported an anonymous death threat to PMO, and she suspected that Cpl Baumann had left dead roses in the front seat of her car. In rebuttal, the Government presented opinion evidence that Cpl Baumann is a truthful person.

Following the admission of evidence on the merits, the military judge conducted an Article 39a, UCMJ, session to discuss the instructions with counsel. During that session, the military judge asked the appellant's trial defense counsel if he had any objections to Appellate Exhibit XXI, his proposed instructions. Trial defense counsel voiced no objections. Concerning the issue of knowledge, the military judge proposed to instruct the members that: "Knowledge by the accused of the presence of the substance and knowledge of its contraband nature may be in-

ferred from the surrounding circumstances including, but not limited to, all evidence before you relating to the circumstances surrounding the alleged use of marijuana." Record at 269. The proposed instructions also included the following language: "With regard to Specification 1 of Charge II, you may infer from the presence of marijuana, or THC metabolite in the accused's urine that the accused knew he used marijuana. However, the drawing of any inference is not required." *Id.* Following argument of counsel the military judge gave the members instructions that included the language quoted above. When offered the opportunity to object to the instructions, the trial defense counsel affirmatively stated that he had no objection.

Prior to the military judge instructing the members, both the trial counsel and the trial defense counsel presented their arguments. The trial counsel referred to the inference of wrongfulness on three occasions during his argument. Specifically, he argued:

The judge is going to tell you that the law says knowledge of the presence of marijuana can be inferred from the presence of the metabolite THC in the accused's urine. This is what I said to you at the beginning of this trial. The law says one thing more, though. It says that this inference, the fact that the accused has THC in his urine, that, just that, never mind Corporal Baumann, just that, in it [sic] and of itself satisfies the government's burden of proof at this trial for this offense. We don't even need Corporal Baumann. We can rely just on the urinalysis. We don't need any other evidence to prove this use of marijuana.

. . . .

Maybe the best proof of Corporal Baumann's truthfulness and the fact that he is telling the truth is the urinalysis. That is the most unbiased proof that you have. The most uncomplicated proof that you have. That urinalysis, those two GCMS tests, conclusively, without a doubt, says to you that the accused had the metabolite in his urine. And you found out from the expert that his body must have ingested marijuana and metabolized it to get that

THC metabolite in his urine. And that confirms Corporal Baumann's testimony right there. And the urinalysis, that's true no matter what Corporal Hetrick says about Corporal Baumann. . . .

. . . .

Defense counsel has focused entirely pretty much on Corporal Baumann; Corporal Baumann this, Corporal Baumann that. Don't do the same thing, members. That's exactly what he wants you to do. *If Corporal Baumann was the only evidence, we wouldn't even be here.* Corporal Baumann is not the only evidence. He may be the cherry on the top, the icing on the cake, the urinalysis is the uncontroverted evidence. And Corporal Baumann is in agreement with that urinalysis. And together, those two, those two pieces of evidence are extremely powerful evidence. . . .

Record at 252, 256, 264 (emphasis added).

## Discussion

■ In his single assignment of error the appellant attacks the legal and factual sufficiency of the evidence used to convict him of the wrongful use of marijuana. Initially, he argues that the testimony of Cpl Baumann, the only witness who provided direct evidence that the appellant had smoked marijuana, should not be given any weight. He bases this argument on the fact that Cpl Baumann was biased against the appellant because his girlfriend had left him for the appellant, and because Cpl Baumann received a favorable pretrial agreement because he agreed to testify against the appellant. Appellant's Brief dated 27 Mar 2000 at 7–9. He also argues that the Government could not rely on the inference of wrongfulness due to the irregularities in the testing procedures of his urine sample and the failure of the Government to introduce evidence that he felt the physical or psychological effects of marijuana. *Id.* at 9–12. The appellant relies upon *United States v. Campbell,* 50 M.J. 154, 159 (1999), *supplemented on reconsideration,* 52 M.J. 386 (2000), in support of this latter argument. The case before us, however, involves more than the

issue of factual and legal sufficiency of the evidence.

Since our superior court decided *Campbell*, this is the first case concerning use of a controlled substance to come before us that was tried before members, and where there was direct evidence presented of the use of the controlled substance in addition to the results of the urinalysis test. Before the members could convict the appellant for the wrongful use of marijuana they had to be convinced beyond a reasonable doubt of two elements: that the appellant used marijuana, and that the use was wrongful. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 37b(2). Both elements, however, contain a knowledge requirement. *United States v. Mance*, 26 M.J. 244, 253–254 (C.M.A.1988).

> Knowledge of the presence of the controlled substance is a required component of use. Knowledge of the presence of the controlled substance may be inferred from the presence of the controlled substance in the accused's body or from other circumstantial evidence. This permissive inference may be legally sufficient to satisfy the government's burden of proof as to knowledge.

MCM, Part IV, ¶ 37c(10). *Campbell*, however, has clarified the conditions under which the Government may rely upon this permissive inference.

Prior to *Campbell*, it was well established that the trier of fact could draw a permissive inference of wrongful drug use based on a positive urinalysis. *United States v. Pabon*, 42 M.J. 404, 405–06 (1995). *Campbell*, however, provides that the "prosecution cannot rely solely on the presence in the body of the drug or its constituent elements." *Campbell*, 50 M.J. at 160. It further provides that where the prosecution intends to rely upon this inference, the Government must "establish the reliability of the testing methodology and explain the significance of the results of the test of the accused's sample." *Id.* This is normally done through the testimony of an expert witness. When such a witness is called:

> The prosecution's expert testimony must show: (1) that the metabolite is "not natu-

rally produced by the body" or any substance other than the drug in question; (2) that the cutoff level and reported concentration are high enough to reasonably discount the possibility of unknowing ingestion and to indicate a reasonable likelihood that the user at some time would have "experienced the physical and psychological effects of the drug"; and (3) that the testing methodology reliably detected the presence and reliably quantified the concentration of the drug or metabolite in the sample.

*Id.* (citations quotes omitted).

*Campbell* also makes clear that there are other ways to prove the use of a controlled substance. "If the test results, standing alone, do not provide a rational basis for inferring knowing use, then the prosecution must produce other direct or circumstantial evidence of knowing use in order to meet its burden of proof." *Campbell*, 52 M.J. at 388.

In the appellant's case, the Government adequately established that THC does not naturally occur in the human body, and that the results of both urine tests were reliable. The Government also presented the testimony of the forensic chemist, Ms. Driskell, that the DoD cutoff level for THC was sufficiently high enough to discount passive inhalation. Her testimony, however, did not establish that the appellant's ng/ml of THC was high enough to indicate that the appellant experienced the physical and psychological effects of the drug. Accordingly, the prosecution could not rely upon the permissive inference derived solely from the presence of THC in his urine. *See Campbell*, 52 M.J. at 388–389. Other evidence, however, was presented by the Government that the members in this case could have relied upon to find or infer that the appellant knowingly used marijuana. Specifically, that other evidence was the testimony of Cpl Baumann and the evidence that the appellant had been in Cpl Baumann's room during a period of time that others smelled burning marijuana emitting from the room.

In support of his position, the appellant relies upon *Campbell*, 50 M.J. at 154, *supplemented on reconsideration*, 52 M.J. at 386.

If the only evidence of appellant's guilt was the results of the tests performed on his urine by the NDSL, we would concur with the appellant's argument and find the evidence to be legally insufficient. *United States v. Barnes*, 53 M.J. 624 (N.M.Ct.Crim. App.2000). Because other evidence of the appellant's use of marijuana was also presented, and because the Government relied upon the permissive inference of knowledge, we find it premature to decide whether the evidence was legally and factually sufficient. Rather, we turn to the question of whether it was error to instruct the members that they could infer knowledge based solely upon the results of the urinalysis test. We rely on *Campbell* in concluding that the military judge erred in instructing the members that they could infer knowledge based upon the permissive inference that could be drawn from the fact that THC had been found in the appellant's urine.

As noted in the facts, set out above, the military judge instructed the members prior to deliberation on findings that they could infer that the appellant knew that he had used marijuana based upon the presence of THC in his urine. This instruction was given without objection, and was a standard instruction at the time of the appellant's court-martial. Under the facts of this case, *Campbell* renders that instruction erroneous.

█ Absent plain error, the failure to object to an instruction constitutes waiver. RULE FOR COURTS-MARTIAL 920(f), MANUAL FOR COURTS MARTIAL, UNITED STATES (1998 ed.). With respect to plain error the appellant has the burden of persuasion that the alleged error was obvious and substantial, and that it adversely affected his substantial rights. *See United States v. Kho*, 54 M.J. 63 (2000); *United States v. Powell*, 49 M.J. 460, 463 (1998)(citing *United States v. Fisher*, 21 M.J. 327 (C.M.A.1986)), *United States v. Brewick*, 47 M.J. 730, 733 (N.M.Ct.Crim.App.

1997), Art. 59a, UCMJ, 10 U.S.C. § 859a. Furthermore, in *Fisher*, in the context of instructional error, our superior court has held that the error must have an "unfair prejudicial impact on the jury's deliberations." *Fisher*, 21 M.J. at 328 (*quoting United ed States v. Young*, 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

In the Government's Answer to Specified Issues, the Government conceded that if the evidence did not support the use of the permissive inference, then the instructional error was obvious. *Id.* at 6, 105 S.Ct. 1038. The Government cites *Campbell*, 50 M.J. at 161. We concur that in light of *Campbell* the instructional error was obvious and, we add, substantial.[2] The Government, however, argues that the appellant was not prejudiced by the erroneous instruction, citing *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *United States v. Mari*, 47 F.3d 782, 786 (6th Cir.1995); and *United States v. Brown*, 50 M.J. 262 (1999). The appellant, however, also cites *Griffin* and *Mari* in support of his argument that he was prejudiced by the erroneous instruction.

In *Griffin*, the accused was charged with a conspiracy wherein the indictment alleged two objects of the conspiracy. At trial the Government produced evidence that implicated Griffin in only one of the two objects of the conspiracy. The jury was instructed that they could convict Griffin if they found that she had participated in either object of the conspiracy. The jury returned a general verdict of guilty to the conspiracy as charged. On appeal, Griffin sought to overturn her conviction alleging instructional error. The Supreme Court held that so long as there was evidence sufficient to support participation in either object of the conspiracy, the conviction was valid. In essence, it was a factual dispute. As Justice Scalia wrote:

> Jurors are not generally equipped to determine whether a particular theory of

---

**2.** The result in this case is compelled by *United States v. Campbell*, 50 M.J. 154 (1999), *supplemented on reconsideration*, 52 M.J. 386 (2000). Because *Campbell* asserts that it "does not establish new law," *Campbell*, 50 M.J. at 161 n. 2, we conclude that the instructional error in this case regarding the use of the permissive inference must be plain error, and thus not waived by the failure to object at trial. We are sympathetic to the plight of the military judge in this case, however, who gave the instruction before *Campbell* was decided, at a time when it was not considered to be erroneous under the state of the law as understood by virtually all who practiced military law.

conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence.

*Griffin,* 502 U.S. at 59, 112 S.Ct. 466 (emphasis in original).

Both *United States v. Mari,* 47 F.3d at 782, and *United States v. Brown,* 50 M.J. at 262, addressed the issue of whether it was error to give an instruction on deliberate avoidance. Both cases concerned controlled substances, and both accused claimed that they did not know of the presence of the controlled substance. While *Mari* did not specifically find the instruction to have been erroneous, both courts analyzed the instruction and found that any error that existed was harmless. Both courts examined the instructions to insure that the juries had not been instructed in such a manner that they could have convicted either Mari or Brown on a negligence theory. Since the instructions in both cases specifically precluded a guilty finding based on negligence, and since jurors were presumed to follow the law, the errors were harmless.

■ The case before us is factually different from the cases cited to us by the Government and the appellant. Here the Government sought to prove that the appellant had wrongfully used marijuana by introducing direct and circumstantial evidence of the use. Even the fact that THC was found in the appellant's urine could have been legitimately considered by the members to prove that the appellant had used marijuana. The members could also consider the circumstances surrounding the charged use as circumstantial evidence of the of the appellant's knowledge that its use was wrongful. The Government took it one step farther, however, by seeking also to rely on the permissive infer-

ence of knowing use based upon the fact that the metabolite for marijuana was found in his urine. Thus the members were faced with different types of proof, direct evidence, circumstantial evidence, and a permissive inference. This latter form of proof, under the facts of this case, is one that the members should not have been allowed to consider.

The military judge provided the members with the law through his instructions. As instructed, the members had no way of knowing that they should not consider solely the presence of the metabolite in the appellant's urine as evidence of his knowing use of the substance. This, in our view, was a "legally inadequate theory [from which the member's] own intelligence and experience [could not] save them from ... error." *Griffin,* 502 U.S at 59, 112 S.Ct. 466. It was not, in our view, a "factually inadequate theory." *Id.*

Based upon the record before us, we are unable to conclude that the members did not convict the appellant in reliance upon the *erroneous instruction concerning use of the* permissive inference based solely on the presence of THC in the appellant's urine. The basis for the members' findings are particularly difficult to discern where the members returned a not guilty finding on a specification alleging the distribution of marijuana, and where the only evidence of the distribution was the testimony of Cpl Baumann. Additionally, we note that just before the members were instructed about the permissive inference, the trial counsel forcefully argued that all they really needed to consider on the issue of whether the appellant used marijuana was the permissive inference based solely upon the presence of the marijuana metabolite being found in the appellant's urine. All the other evidence was merely "the cherry on the top, the icing on the cake." Record at 264. Under these facts, we find that the military judge erred in instructing the members on the use of the permissive inference and that this error materially prejudiced the substantial rights of the appellant. Since we find prejudice, we also find plain error.

## Conclusion

Accordingly, we affirm the findings of guilty to Specifications 1 and 2 of Charge I, and Charge I. We set aside the findings of guilty to Specification 1 of Charge II, and Charge II, and the sentence. The record of trial is returned to the Judge Advocate General of the Navy for return to an appropriate convening authority. A rehearing on the Charge and Specification we have set aside is authorized, as is rehearing on the sentence, or both. After the convening authority has taken his action the record will be resubmitted to this Court for final review consistent with our responsibilities as enunciated in *Boudreaux v. United States Navy–Marine Corps Court of Military Review*, 28 M.J. 181 (C.M.A.1989).

Judge OZMUN and Judge NAUGLE, concur.